**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         bscott@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PHILLIP MORRIS INTERNATIONAL INC. and SWEDISH MATCH NORTH AMERICA, LLC, | |
| Defendants. | |

CLASS ACTION COMPLAINT

Plaintiff John Doe ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendants Phillip Morris International Inc. ("Phillip Morris") and Swedish Match North America, LLC ("Swedish Match") (Phillip Morris and Swedish Match, collectively, "Defendants"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all United States citizens who used oral nicotine pouches produced and manufactured by Defendants and marketed and sold under the brand name ZYN.[1]

2.      Oral nicotine pouches are the latest chapter of the tobacco-company playbook, including the playbook of Defendants, to hook adolescents and young adults on nicotine – a highly addictive drug – thereby creating a captured market for nicotine products

3.      Indeed, as the government began cracking down on combustible cigarettes and fewer adolescents and young adults chose to smoke combustible cigarettes, the tobacco industry, including Defendants, needed a way to push nicotine products on consumers. The path forward for Defendants was ZYN.

4.      ZYN does little more than provide a new delivery mechanism for addictive nicotine – namely, ZYN delivers what Defendants refer to as "tobacco-free" nicotine through a water-soluble pouch that users place between their gum and upper lip.

5.      A key aspect of ZYN is the ability to use it discretely. ZYN has no odor or smoke and does not require users to spit to avoid ingesting toxins.

6.      As shown below, ZYN is sold in containers (referred to as "cans") deceptively designed to look like containers for a popular brand of mints. The pouch itself resembles a piece of gum, as opposed to anything people would affiliate with a nicotine or tobacco product.

---

[1] The ZYN products ("ZYN") include ZYN Wintergreen, ZYN Spearmint, ZYN Cool Mint, ZYN Citrus, ZYN Peppermint, ZYN Cinnamon, ZYN Smooth, ZYN Chill, ZYN Coffee and ZYN Menthol.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



 

18    7.    Despite ZYN merely providing a new delivery mechanism for Defendants'

19  addictive nicotine, Defendants deceptively marketed and promoted ZYN as being healthy and a

20  nicotine-cessation device, whereas in fact, as Defendants knew, ZYN had no health benefits, was

21  not a proven or authorized cessation device and would merely lead to nicotine addiction for new

22  users and sustain nicotine addiction for those already addicted.

23    8.    According to Defendants: (a) ZYN is "tobacco-free"; (b) "ZYN nicotine pouches

24  are a fresh way to enjoy nicotine"; (c) ZYN is made with "food-grade flavorings," further

25  described as "natural additives"; (d); ZYN uses ingredients "[c]ommonly found in chewing gum;

26  (e) ZYN uses a sweetener "often used in beverages and confections as a flavor enhancer"; (f) ZYN

27  uses "[m]inerals used in baked goods"; and (g) ZYN contains "pharmaceutical nicotine."

28

9.      As has been the case for decades, Defendants made a targeted effort to push ZYN on adolescents and young adults, emphasizing the ability to use it discretely – "They're smoke-free, spit-free and hands-free" and "can be used anywhere" without the need for refills or batteries. Moreover, Defendants promoted ZYN through the use of social media influencers, appealing flavors and packaging and an advertising campaign designed to make it appear that using ZYN was fun and cool.

10.     In the end, Defendants' purpose in manufacturing, marketing and selling ZYN was to hook a new generation of users on nicotine and maintain the nicotine addictions of those already addicted. By doing so, Defendants ensured their sustained success and profitability.

11.     Plaintiff brings this action for legal and equitable remedies resulting from Defendants' unlawful conduct.

## **JURISDICTION AND VENUE**

12.     The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Nationwide Class and subclasses, as further defined below, and there is minimal diversity.

13.     The Court has personal jurisdiction over each Defendant because each Defendant availed itself of the privilege of doing business in the State of California and has sufficient minimum contacts with the State of California in connection with the conduct at issue in this case, including marketing, advertising and selling ZYN within the State of California

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because each Defendant is subject to the Court's personal jurisdiction.

## THE PARTIES

### *Plaintiff*

15.     Plaintiff John Doe currently is an adult citizen of the State of California and is domiciled in Rancho Cordova, California. Plaintiff Doe first purchased ZYN while under the age of eighteen.

### *Defendant Phillip Morris*

16.     Defendant Phillip Morris is incorporated in the State of Virginia and has its principal of business in Stamford, Connecticut.

17.     While historically a producer and seller of combustible tobacco products (*e.g.*, cigarettes), as of 2022, approximately 32% of Defendant Phillip Morris's net revenues came from its "smoke-free portfolio," of which ZYN is a part.

18.     In connection with developing its smoke-free portfolio, in 2022, Defendant Phillip Morris completed its acquisition of Defendant Swedish Match, which Phillip Morris contends positions it as the clear multicategory leader globally for smoke-free products. Phillip Morris promoted the acquisition of Swedish Match as a key milestone in Phillip Morris's transformation to becoming a smoke-free company.

19.     Defendant Phillip Morris's 2022 net revenues were approximately $31.8 billion, $10.2 billion of which was derived from Phillip Morris's smoke-free products, including ZYN. As alleged further below, ZYN has become a key part of Phillip Morris's business and plans for future growth.

### *Defendant Swedish Match*

20.     Defendant Swedish Match is incorporated in the State of Delaware and has its principal place of business in Richmond, Virginia.

21.     Defendant Swedish Match created ZYN and is a market leader in oral nicotine delivery with a significant presence in the United States. Indeed, under the brand-name ZYN, Swedish Match has a leading nicotine pouch franchise in the United States.

22.     In 2022, Defendant Swedish Match's parent company, Swedish Match AB, reported a 15% increase in its sales of smoke-free products, mainly driven by strong sales of ZYN in the United States, where shipment volumes grew to a record level.

## FACTUAL ALLEGATIONS

### *The Tobacco Industry Playbook*

#### *Hooking Consumers on Nicotine*

23.     It is no secret that the success of the tobacco industry has been, and remains, directly tied to getting consumers, especially youth (children 11 to 17 years old) and young adults (18 to 24 years old), addicted to nicotine.

24.     Nicotine is the drug in tobacco that causes addiction.[2]

25.     As the patent for ZYN concedes, "nicotine is a strongly addictive substance [sic] and it is generally accepted that the difficulty to quit smoking results from the fact that smokers are dependent upon nicotine."[3]

26.     The United States Surgeon General has compared the addictive properties of nicotine to that of heroin and cocaine.[4]

27.     The United States Surgeon General has further found that "[p]eople who begin to smoke at an early age are more likely to develop severe levels of nicotine addiction than are those who start at a later age."[5]

---

[2] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 23, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[3] United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form, at 1. (Oct. 20, 2015).

[4] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 23, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[5] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 16, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

28.    Youth are particularly vulnerable to nicotine addiction. According to the United States Surgeon General, "[n]early 9 out of 10 smokers start smoking by age 18."[6] Moreover, "adolescent smokeless tobacco users are more likely than nonusers to become adult cigarette smokers."[7]

### The Negative Consequences of Nicotine

29.    According to a letter sent to the Acting Commissioner of the United States Food and Drug Administration by the Attorneys General of twenty-nine states, nicotine use leads to serious negative consequences.[8]

30.    As a threshold matter, products containing nicotine serve as a gateway to nicotine addiction for youth who have not previously used nicotine.[9]

31.    Further, nicotine has particularly harmful effects on the developing brain, with youth being significantly more likely to come addicted than adults.[10]

32.    Youth nicotine consumption is also associated with various adverse physical outcomes, such as nicotine toxicity and poisoning, as well as mental health and behavioral problems like major depressive disorder, academic problems and addiction to other substances.[11]

---

[6] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet* (June 6, 2017), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html (last accessed on Mar. 18, 2024).

[7] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at i, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[8] Aug. 18, 2021 Attorneys General Letter to Janet Woodstock, Acting Commissioner, U.S. Food and Drug Admin.

[9] Aug. 18, 2021 Attorneys General Letter to Janet Woodstock, Acting Commissioner, U.S. Food and Drug Admin.

[10] Aug. 18, 2021 Attorneys General Letter to Janet Woodstock, Acting Commissioner, U.S. Food and Drug Admin. (*citing* Menglu Yuan, *Nicotine and the adolescent brain*, 593 (16) J. of Psychology, 3397-3412 (2015).

[11] Aug. 18, 2021 Attorneys General Letter to Janet Woodstock, Acting Commissioner, U.S. Food and Drug Admin.

33.     Further, research has revealed that use of nicotine at an early age, along with pleasurable initial experiences, are correlated with daily use and lifetime nicotine dependence.[12]

34.     Nicotine can also increase blood sugar, raise a person's heart rate and blood sugar and harden the walls of arteries, thereby contributing to heart disease and heart attacks.[13]

**Nicotine Salts**

35.     In connection with hooking consumers on nicotine, the tobacco industry, including Defendants, found a way to increase the nicotine content of their products in a manner that did not cause throat burning or other side effects. This was done through the creation of nicotine salt.

36.     As nicotine concentration increases, so too does the pH balance, or alkalinity, of the nicotine, which can result in throat burning. By combining a nicotine base with certain acids, the pH balance can be reduced, thereby making the higher concentration of nicotine tolerable for users. The end result of this process is nicotine salt.

**Targeting Youth and Young Adults**

37.     It has long been known that the tobacco industry views youth and young adults as the lifeblood of the industry. If a company can hook a child on nicotine, while building brand loyalty, the company can generate a consumer of its goods for many years to follow.

38.     According to the United States Surgeon General, "[m]ost smokers start as adolescents: cigarette companies need to recruit new smokers from among youth, and their advertising campaigns appeal to the aspirations of adolescents."[14]

39.     According to internal documents of an affiliate of Defendant Phillip Morris, "[t]oday's teenager is tomorrow's potential regular customer":

---

[12] *What Is Zyn and What Are Oral Nicotine Pouches*, <u>Truth Initiative</u> (May 23, 2023), https://truthinitiative.org/research-resources/emerging-tobacco-products/what-zyn-and-what-are-oral-nicotine-pouches (last accessed on Mar. 18, 2024).

[13] Daniel Blum, *A New Wave of Nicotine Products Comes Under Scrutiny*, <u>The Seattle Times</u> (Jan. 24, 2024), https://www.seattletimes.com/seattle-news/health/a-new-wave-of-nicotine-products-comes-under-scrutiny/ (last accessed on Mar. 18, 2024).

[14] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 522, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

---

It is important to know as much as possible about teenage smoking patterns and attitudes. ***Today's teenager is tomorrow's potential regular customer and the overwhelming majority of smokers first begin to smoke while in their teens. . . .*** The smoking patterns of teen-agers are particularly important to Philip Morris. . . the share index is highest in the youngest group for all Marlboro and Virginia Slims packings. At least a part of the success of Marlboro Red during its most rapid growth period was because it became the brand of choice among teenagers who then stuck with it as they grew older.[15]

40.     Additional internal documents of the affiliate show the importance of the youth and young adult market to the company's success. For instance, a 1953 letter from the vice president of what is now Phillip Morris USA, Inc. observed that "'47% of the population, fifteen years and older, smokes cigarettes' and that 'we have our greatest strength in the 15-24 age group.'"[16] Similarly, a 1973 memorandum stated that "' [a]lthough the total population will increase by 3.4% during the 1973-1978 period, ***the fifteen to nineteen year old age group from which many new smokers are gained***, will only increase by 1.9% . . . ."[17]

41.     As alleged above, the tobacco industry has recognized the need to advertise to and recruit youths and young adults. Indeed, the United States Surgeon General has found that "[b]ecause youth are brand loyal, attracting them to a particular brand pays off for tobacco companies in the long term. In fact, youth appear to be even more responsive to advertising appeals than are adults."[18]

42.     To lure youth into the world of smoking, tobacco advertising has historically sought to fulfill "many of the aspirations of young people by effectively using themes of independence, liberation, attractiveness, adventurousness, sophistication, glamour, athleticism, social acceptability and inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool' . . . ."[19]

---

[15] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids, at 1 (May 14, 2001) (emphasis added), https://assets.tobaccofreekids.org/factsheets/0114.pdf (last accessed on Mar. 18, 2024).

[16] *U.S. v. Phillip Morris USA, Inc.*, 449 F.Supp.2d 1, 580 (D.D.C. 2006).

[17] *U.S. v. Phillip Morris USA, Inc.*, 449 F.Supp.2d 1, 581 (D.D.C. 2006) (emphasis added).

[18] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 522, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[19] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 519 (*citing U.S. v. Phillip Morris USA, Inc.*, 449 F.Supp.2d 1, 980 (D.D.C. 2006),

---

43.     The tobacco industry also has historically relied on peer pressure to market its products to youth.[20]

44.     The United States Surgeon General has found that "to the extent that tobacco industry marketing and promotional activities stimulate peers and parents to smoke, these influences contribute to smoking by adolescents."[21]

45.     The United States Surgeon General has further found that the following two processes underlie the role peers play in adolescent smoking: socialization and selection:

> ***Peers who smoke socialize the nonsmoking members of a social network*** by increasing perceptions of the prevalence of smoking, by modeling the behavior, and through the process of peer acceptance. Adolescents who believe smoking to be prevalent are more likely to smoke. Moreover, adolescents who hold positive beliefs about smokers or who smoke themselves choose peers who affirm those beliefs and attitudes that were primed by tobacco marketing. In this regard, tobacco marketing, socialization, and the selection of friends contribute to a dynamic system that serves to increase adolescent smoking social networks.[22]

46.     Based on the findings above, the United States Surgeon General has concluded that "it is clear the tobacco industry understands the need to be accepted, particularly among youth, and has attempted to exploit this need through its marketing efforts."[23]

---

https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[20] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 519, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[21] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 519, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[22] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 520 (internal citations omitted) (emphasis added), https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[23] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 520, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

---

*The Use of Flavoring to Attract Youth and Young Adults*

47.     "Nicotine is one of the harshest chemicals in tobacco smoke and the most important factor in tobacco dependence."[24]

48.     The harshness of nicotine makes it unenjoyable for first-time users. Yet, because of its central role in making users dependent on products offered by the tobacco industry, the industry had to find a way to mask the harshness.[25]

49.     During a 1974 meeting of senior scientists of a then competitor of Phillip Morris USA, Inc., they discussed "cigarettes for beginning smokers, noting that such a cigarette should be 'low in irritation and possibly contain added flavors to make it easier for those who never smoked before to acquire the taste for it more quickly.'"[26]

50.     Out of the desire for a less harsh cigarette came the growth of the menthol cigarette.[27] Menthol provides a cooling sensation that many smokers, including new smokers, find appealing and less harsh.[28]

---

[24] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 535, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[25] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 535, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[26] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 536, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[27] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 537, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[28] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 537, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

51.     In addition to menthol, older tobacco industry documents discuss the use of flavoring agents in cigarettes to attract young smokers.[29] Through the early part of this century, manufacturers offered flavors such as Crema, Mandarin Mint, Mandalay Lime, Midnight Berry and Kauai Kolada.[30]

52.     While the tobacco industry consistently maintained that flavored cigarettes were intended for adult smokers, surveys have revealed that young smokers were more likely to have tried such cigarettes than adult smokers.[31]

53.     In 2009, the Family Smoking Prevention and Tobacco Control Act (the "Tobacco Control Act") was enacted into law. Among many other things, the Tobacco Control Act prohibited cigarettes or its component parts from containing flavoring, other than menthol.[32]

54.     Nevertheless, according to the 2023 National Youth Tobacco Survey published by the United States Food and Drug Administration, almost 90% of youth who use e-cigarettes use flavored e-cigarettes.[33]

### Targeting of Youth and Young Adults Through Point-of-Sale Marketing

55.     The United States Surgeon General has found that "tobacco marketing at the point-of-sale is associated with the use of tobacco by youth."[34]

---

[29] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 538, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[30] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 538, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[31] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 538-39, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[32] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[33] U.S. Food and Drug Admin., *Results from the Annual Youth Tobacco Survey* (2023).

[34] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 545,

---

56.     According to a United States Surgeon General report, convenience stores – both those that sell and do not sell gas – have more tobacco advertising and promotions than other types of stores, which increases the likelihood of exposing youth to pro-smoking messages while they shop.[35] This exposure "can affect initiation rates among those exposed, particularly if stores are near schools."[36]

57.     It has also been reported that stores close to schools have more exterior tobacco advertising than stores further away, and stores where youth shop tend to have more cigarette marketing than other stores in the same community.[37]

58.     Importantly, the tobacco industry exerts substantial control over product location, advertising and product pricing by offering stores and retailers financial incentives.[38]

***Smokeless Tobacco***

59.     The tobacco industry's playbook was not limited to cigarettes and also included smokeless tobacco products.

---

https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[35] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 543, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[36] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 543, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[37] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 543, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[38] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 542, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

60.     In a 2012 report, the United States Surgeon General concluded that the popularity of smokeless tobacco among young adults appeared to be linked to the marketing of flavored tobacco products that similarly might be attractive to youth.[39]

61.     In addition to flavoring, by the 1980s, one smokeless tobacco company offered smokeless tobacco with varying levels of free nicotine, as part of "graduation strategy." Under the graduation strategy, new users were encouraged to start with products with lower nicotine levels and later "graduate" to increased strengths.[40] In connection with the graduation strategy, the company offered flavorings at the lower nicotine levels.[41]

62.     A study conducted by the National Institute on Drug Abuse determined that smokeless tobacco products with higher free nicotine levels resulted in higher nicotine blood levels and stronger addictive effects.[42]

63.     The United States Surgeon General found that the graduation strategy demonstrated how the integration of product design with marketing served to increase smokeless tobacco use by youth and young adult males and actually reversed a previous decline in such use.[43]

---

[39] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[40] *See* U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[41] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[42] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[43] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 539, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

64.     In 2010, a tobacco company began test-marketing dissolvable smokeless tobacco products, in connection with a smokeless tobacco product referred to as snus. In connection therewith, the company packaged smokeless tobacco portions in teabag-like porous pouches that it believed might ease adoption of smokeless tobacco by novices.[44]

65.     Foreshadowing what would be the product design of ZYN, by 2011, smokeless tobacco companies were using both the portion pouch and flavorings in connection with snus.[45] Moreover, the tobacco industry promoted the use of smokeless tobacco as a way to discretely obtain nicotine where indoor smoking was prohibited.[46]

***The Rise of ZYN***

    ***The Patent***

66.     With the enactment of the Tobacco Control Act in 2009 and other anti-smoking laws in the United States, a need grew for alternative nicotine products that would keep people addicted to the drug but was not subject to the new regulations.

67.     By 2012, the patent application for what became ZYN was filed.[47] The patent was issued on October 20, 2015.[48]

---

[44] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 540, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[45] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 540, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[46] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 540, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[47] United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form. (Oct. 20, 2015).

[48] United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form. (Oct. 20, 2015).

68.     As described in the patent abstract, the invention related to, *inter alia*, "a product for oral delivery of nicotine containing a core comprising a powder of at least one free nicotine salt, at least one pH adjusting agent and at least one filler, and a water insoluble pouch . . . ."[49]

69.     According to the patent, the "administration of nicotine from tobacco by smoking provides satisfaction" but because smoking tobacco has health hazards, "it is desirable to formulate alternative means of administering nicotine in a pleasurable manner to facilitate reduction of or cessation from smoking."[50] As alleged further below, ZYN has not been recognized as a smoking reduction or cessation device.

70.     As described in the patent, the secret of ZYN is its ability to: (a) match the quick uptake of nicotine that a cigarette smoker experiences that results in "rapid satisfaction"; and (b) give almost complete delivery of the nicotine in the pouch.[51]

71.     Moreover, like snus pouches of old, (a) the amount of nicotine offered in a ZYN pouch could be altered from minimal amounts to much higher strengths; and (b) ZYN's contents could function as a sweetener or flavor in order to "obtain an attractive taste."[52]

72.     The patent described example flavors as, *inter alia*, orange, mandarin, citrus, lemon, peppermint, mint, menthol, wintergreen, coffee, vanilla, lime, apple, peach and mixtures thereof.[53]

---

[49] United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form, at Abstract. (Oct. 20, 2015).

[50] United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form, at 1. (Oct. 20, 2015).

[51] *See* United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form, at 1-4. (Oct. 20, 2015).

[52] *See* United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form, at 3, 6-7. (Oct. 20, 2015).

[53] United States Patent No. US 9,161,908 B2 – Pouch Containing Nicotine in Free Salt Form, at 7. (Oct. 20, 2015).

*Lack of Regulation*

73.     Importantly, because ZYN does not contain tobacco leaf, it is not categorized as a smokeless tobacco product and, therefore, is not regulated as tightly as smokeless tobacco or combustible tobacco in the United States.[54]

74.     Indeed, regulations do not currently exist that prevent or restrict flavored oral nicotine pouches.[55]

*ZYN – By the Numbers*

75.     ZYN has had a meteoric rise in popularity and sales in the United States. The 2023 third-quarter investor report for Defendant Phillip Morris described ZYN's growth in the United States as "remarkable."[56]

76.     As of the third quarter of 2023, ZYN accounted for approximately 71% of the oral nicotine pouch market share.[57]

77.     Moreover, between the first quarter of 2018 and the third quarter of 2023, the amount of ZYN cans shipped in the United States increased from 6 million to 334 million.[58]

78.     Further, Defendant Phillip Morris predicts that by 2026, it will ship between 800 million and 1 billion ZYN cans, mostly in the United States.[59]

79.     Moreover, Defendant Phillip Morris predicts that by 2030, ZYN will produce net revenues of $3.5 billion.[60]

---

[54] *What Is Zyn and What Are Oral Nicotine Pouches*, <u>Truth Initiative</u> (May 23, 2023), https://truthinitiative.org/research-resources/emerging-tobacco-products/what-zyn-and-what-are-oral-nicotine-pouches (last accessed on Mar. 18, 2024).

[55] *What Is Zyn and What Are Oral Nicotine Pouches*, <u>Truth Initiative</u> (May 23, 2023), https://truthinitiative.org/research-resources/emerging-tobacco-products/what-zyn-and-what-are-oral-nicotine-pouches (last accessed on Mar. 18, 2024).

[56] Phillip Morris Int'l Investor Information, at 11 (Nov. 2023).

[57] Phillip Morris Int'l Investor Information, at 11 (Nov. 2023).

[58] Phillip Morris Int'l Investor Information, at 11 (Nov. 2023).

[59] Phillip Morris Int'l Investor Day – Presentation of Lars Dahlgren, at 16 (Sept. 28, 2023).

[60] Phillip Morris Int'l Investor Day – Presentation of Lars Dahlgren, at 20 (Sept. 28, 2023).

*The Dangers of ZYN*

80.     Because ZYN is a nicotine-delivery device, users of ZYN are subject to the negative consequences of nicotine use, as alleged above.

81.     Indeed, on information and belief, the negative consequences of nicotine are greater with ZYN use than with combustible cigarette use because ZYN is typically sold in the United States in three and six milligram strengths, whereas smokers absorb little more than one milligram of nicotine from a cigarette.[61]

82.     Additional negative consequences of ZYN use can include irritation of the gums, a sore mouth and nausea.[62]

83.     Notably, a study funded by the Centers for Disease Control and Prevention concluded that the "high levels of nicotine and prominent use of flavors in nicotine pouches raise concerns about potential initiation and use amount vulnerable populations, including youth."[63]

*The Marketing of ZYN*

84.     To achieve ZYN's meteoric success, Defendants pulled out every play in the tobacco-industry playbook and introduced some new plays. On the whole, the marketing was deceptive, with the goal of winning over young users and building brand loyalty.

***ZYN as a Healthy, Safe Product***

85.     Despite ZYN being nothing more than a method for delivering an addictive drug – nicotine – to users, Defendants deceptively marketed it as a healthy product.

86.     According to ZYN's website, ZYN is a "fresh way to enjoy nicotine."[64]

---

[61] Daniel Blum, *A New Wave of Nicotine Products Comes Under Scrutiny*, The Seattle Times (Jan. 25, 2024), https://www.seattletimes.com/seattle-news/health/a-new-wave-of-nicotine-products-comes-under-scrutiny/ (last access on Mar. 18, 2024).

[62] *Are Nicotine Pouches Safer than Chewing, Smoking or Vaping*, Nebraska Medicine (June 1, 2021), https://www.nebraskamed.com/cancer/lung/quit-smoking/are-nicotine-pouches-safer (last accessed on Mar. 18, 2024).

[63] Stephen Stanfill MS, *et al.*, *Characterization of Total and Unprotonated (Free) Nicotine Content of Nicotine Pouch Products*, Nicotine & Tobacco Research at 1590-96 (Mar. 2, 2021).

[64] https://us.zyn.com/questions/ (last accessed on Mar. 18, 2024).

87.     Moreover, Defendants describe ZYN as containing only "food-grade ingredients," including: (a) a "pharmaceutical-grade version of the same nicotine salt found naturally in plants"; (b) a "plant-based food additive"; (c) filler ingredients "[c]ommonly found in chewing gum"; (d) "[m]inerals used in baked goods" and (e) a "[s]ugar substitute often used in beverages and confections as a flavor enhancer."[65]

88.     In response to a hypothetical question regarding whether it is safe to swallow saliva when using ZYN, Defendants represent that the "nicotine and other food-grade ingredients found in ZYN are not harmful to adults if consumed in small quantities."[66]

89.     In actuality, as Defendants knew, ZYN was designed to be harmful to anyone using ZYN in that it contained the addictive drug, nicotine, and served no purpose other than delivering that addictive drug to users.

90.     On a FAQ page on ZYN's website, the following question is posed: "Are ZYN products safer than cigarettes?" Without answering the question directly, the website states that the "FDA has recognized that there is a continuum of risks related to different methods of nicotine consumption and that there may be less harmful ways to get nicotine." The website juxtaposes that language with the following: "ZYN contains pharmaceutical-grade nicotine and other food-grade ingredients."[67]

91.     The language in the preceding paragraph is intended to deceive, and has deceived, consumers into believing that not only is ZYN "safer" than cigarettes, but that ZYN has been deemed safe by the United States Food and Drug Administration ("FDA"), as indicated by the references to the FDA and the use of "pharmaceutical-grade" nicotine.

92.     The same FAQ page, also asks if the nicotine salt used in ZYN is different from the nicotine salt used in e-cigarettes, vaping and liquids. According to the website, "Nicotine exists in different forms in nature and is commercially available in different forms as well. ZYN uses the

---

[65] https://us.zyn.com/questions/ (last accessed on Mar. 18, 2024).

[66] https://us.zyn.com/questions/ (last accessed on Mar. 18, 2024).

[67] https://us.zyn.com/questions/ (last accessed on Mar. 18, 2024).

same nicotine salt form found in nature, making it more stable than e-cigs, vaping, and liquids . . . ."[68]

93.     Again, by referencing "nature" in connection with the nicotine salt found in ZYN, Defendants intended to deceive, and did deceive, consumers into believing that ZYN is a healthy and safe product.

94.     Further marketing ZYN as something other than a drug-delivering device, the FAQ page answers questions about the dietary value of ZYN, including that: (a) it contains less than 1 calorie per pouch; (b) it contains less than 0.5% of the daily recommended value of sodium; (c) it contains less than 1% of the daily recommended carbohydrate allowance; (d) it is lactose- and gluten-free.[69]

### *Targeting Youth and Young Adults Through the Use of Appealing Themes*

95.     As alleged above, a key part of the tobacco-industry playbook has been to target youth and young adults through appealing themes of independence, liberation, attractiveness, adventurousness, sophistication, glamour, athleticism, social acceptability and inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being cool.

96.     In marketing ZYN, Defendants seized on this type of marketing, as evidenced by the pictures below[70]:

---

[68] https://us.zyn.com/questions/ (last accessed on Mar. 18, 2024).

[69] https://us.zyn.com/questions/ (last accessed on Mar. 18, 2024).

[70] Top three photos from Phillip Morris Int'l Investor Day – Presentation of Lars Dahlgren, at 16 (Sept. 28, 2023); Bottom four photos from Facebook.

---

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18



19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





***Targeting Youth and Young Adults Through Peer Pressure***

97.     As alleged above, historical tobacco-industry documents revealed the industry's mindset that "peers who smoke socialize the nonsmoking members of a social network by increasing perceptions of the prevalence of smoking, by modeling the behavior, and through the process of peer acceptance."[71]

98.     This mindset remains true today, although in modern times, the "social network" consists of influencers on social media who pressure "followers" to act in conformity with the influencers.

99.     With respect to ZYN, influencers who push ZYN on social media networks are referred to a "Zynfluencers." According to a recent article in *Vox*, TikTok has almost 30,000 TikTok videos under the hashtag #ZYN.[72]

100.     Some of these videos have amassed more than 67 million views.[73]

101.     Thus, as a result of influencers, Defendants no longer need to infiltrate actual friend groups to influence others within the group. Rather, through the use of online influencers, Defendants are able to paint with a much broader stroke and influence/pressure far more people than likely was ever thought possible when the peer-pressure model of advertising was created.

***Targeting Youth and Young Adults Through the Use of Flavoring***

102.     ZYN is offered in an assortment of flavors that appeal to youth and young adults, including numerous mint and menthol flavors, citrus and coffee.

103.     As alleged above, flavoring is a key tool used by tobacco companies to initiate youth and young adults into the world of nicotine.

---

[71] U.S. Dep't of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults – A Report of the Surgeon General* (2012), at 520, https://www.ncbi.nlm.nih.gov/books/NBK99237/pdf/Bookshelf_NBK99237.pdf (last accessed on Mar. 18, 2024).

[72] Whizy Kim, *et al.*, *Zyn, the Nicotine Pouch at the Center of a Brewing Culture War, Explained*, Vox (Jan. 30, 2024), https://www.vox.com/health/2024/1/30/24054888/zyn-nicotine-pouch-smokeless-tobacco-snus-snuff-dip-chewing (last accessed on Mar. 18, 2024).

[73] Emily Dreyfuss, *Our Kids Are Living in a Different Digital World*, The New York Times (Jan. 12, 2024), https://www.nytimes.com/2024/01/12/opinion/children-nicotine-zyn-social-media.html (last accessed on Mar. 18, 2024).

104.     As the Attorneys General from twenty-nine states have observed, the common denominator with modern youth-appealing nicotine products, including ZYN is flavors.[74]

105.     Moreover, those Attorneys General recognized that just as flavored combustible and e-cigarettes attracted youth at alarming rates, so too will oral nicotine pouches, like ZYN.[75]

### *Targeting Youth and Young Adults Through the Discrete Nature of Oral Nicotine Pouches*

106.     Defendants also targeted youth and young adults by producing a product that could be used discretely and stored discretely.

107.     As shown above, Defendants package ZYN in cans that resembled a popular brand of mints and easily could be mistaken for such a can of mints. Moreover, ZYN itself looks like a stick of gum.

108.     Further, because ZYN is odorless, smokeless, hands-free, spit-free and does not require charging, ZYN can be used almost anywhere, including in school or in front of parents, without others noticing.

109.     By creating a product that could be used almost anywhere, and at any time of day, Defendants promoted and pushed nicotine addiction on unsuspecting youth and young adults. That is, whereas with a non-discrete product, users might have to put off taking their next hit of ZYN until after school or other select times of day, with ZYN, users could get a nicotine hit at almost any time.

110.     Defendants further promoted and pushed nicotine addiction by utilizing the tobacco-industry graduation strategy – *i.e.*, Defendants offered ZYN in varying nicotine strengths so that once a new user became more experienced with nicotine, the user could begin ingesting greater levels of nicotine into their blood stream each time they used ZYN.

---

[74] Aug. 18, 2021 Attorneys General Letter to Janet Woodstock, Acting Commissioner, U.S. Food and Drug Admin.

[75] Aug. 18, 2021 Attorneys General Letter to Janet Woodstock, Acting Commissioner, U.S. Food and Drug Admin.

***Targeting of Youth and Young Adults Through Point-of-Sale Marketing***

111.    In a letter from Stanford University doctors and professors written in support of a since-enacted California law that bans the sale of flavored-tobacco products, they noted that ZYN is packaged in "brightly colored cans" and displayed in "convenience stores next to energy drinks popular with youth, and on 'power walls' next to Juul and Marlboro."[76]

112.    The doctors and professors attached the following photographs to their letter:



---

[76] Bonnie Halpern-Felsher, *et al.*, Stanford Medicine Letter to California State Senate – Appropriations Committee (Aug. 17, 2020).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18
19
20
21
22
23
24
25
26
27
28

113.    Consistent with the allegations above regarding the tobacco industry's use of point-of-sale marketing to lure youth and young adults, Defendants have used, and continue to use, point-of-sale marketing in the same manner in order to achieve the same results.

### Deceptive Claims that ZYN Is a Smoking-Cessation Device

114.    From the time of the ZYN patent application forward, Defendants have marketed and promoted ZYN as a smoking-cessation device.

115.    However, Defendants have not received authorization from the United States Food and Drug Administration to market ZYN as such a device.

---

CLASS ACTION COMPLAINT                                                                 26

116.    Moreover, there is not data that shows that oral nicotine pouches, generally, are a safe or effective way to quit smoking.[77]

117.    Indeed, doctors and professors at Stanford Medicine have stated that Defendant Swedish Match, through its agents, has made the "unauthorized, unsubstantiated, and illegal claim that . . . ZYN . . . should be used for cessation." As the doctors and professors noted, under federal law, such claims can only be made after the United States Food and Drug Administration has made a specific determination that the product is safe and effective as a cessation device.[78] No such determination has been made.[79]

118.    In connection with Defendant Swedish Match seeking to prevent a proposed bill that would ban the sale of flavored oral nicotine pouches in California from passing through the California legislature, Swedish Match leaned heavily into the cessation-device argument, going so far as to compare ZYN to Nicorette, an approved cessation device.

119.    Defendant Swedish Match's untoward tactics in connection with that California legislation prompted a state senator to write to the Director of the Center for Tobacco Products at the United States Food and Drug Administration to advise him of Swedish Match's conduct. In the letter, the state senator highlighted the various false statements Swedish Match made regarding ZYN being a cessation device and also highlighted Swedish Match's deceptive claims as related to ZYN being made from pharmaceutical-grade nicotine, among other things.

***Plaintiff John Doe's Use of ZYN***

120.    Plaintiff John Doe first used ZYN when under the age of eighteen.

121.    Plaintiff John Doe became aware of ZYN through his friends and advertisements – most notably, point-of-sale advertisements outside of gas stations.

---

[77] *Are Nicotine Pouches Safer than Chewing, Smoking or Vaping?*, <u>Nebraska Medicine</u> (June 1, 2021), https://www.nebraskamed.com/cancer/lung/quit-smoking/are-nicotine-pouches-safer (last accessed on Mar. 18, 2024).

[78] Bonnie Halpern-Felsher, *et al.*, Stanford Medicine Letter to California State Senate – Appropriations Committee (Aug. 17, 2020).

[79] Bonnie Halpern-Felsher, *et al.*, Stanford Medicine Letter to California State Senate – Appropriations Committee (Aug. 17, 2020).

122.   Plaintiff John Doe liked ZYN because of the ability to use it discretely in public places, among other reasons.

123.   In or about December 2022, Plaintiff John Doe purchased and used flavored ZYN – namely, menthol.  Plaintiff purchased ZYN from a smoke shop in Rancho Cordova, California.

124.   At relevant times, Plaintiff John Doe believed ZYN was a safer and healthier alternative to smoking cigarettes and believed that ZYN could help him stop smoking cigarettes, which it failed to do.

125.   As a result of using ZYN, Plaintiff John Doe experienced gun tenderness and nicotine addiction.

**CLASS ACTION ALLEGATIONS**

126.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following class and subclasses (collectively, the "Classes"):

    a.   **Nationwide Class:** All persons in the United States who used oral nicotine pouches produced and manufactured by Defendants and marketed and sold under the brand name ZYN.

    b.   **Youth Subclass:** All persons in the United States who used oral nicotine pouches while under the age of 18 that were produced and manufactured by Defendants and marketed and sold under the brand name ZYN.

    c.   **California Subclass:** All residents of the State of California who used oral nicotine pouches that were produced and manufactured by Defendants and marketed and sold under the brand name ZYN.

    d.   **California Youth Subclass:** All residents of the State of California who used oral nicotine pouches while under the age of 18 that were produced and manufactured by Defendants and marketed and sold under the brand name ZYN.

127.   Plaintiff reserves the right to modify the class and subclass definitions or add subclasses as necessary prior to filing a motion for class certification.

128.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

129.     Excluded from the Classes are Defendants; any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

130.     <u>Numerosity/Ascertainability</u>.  Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of members of the Nationwide Class and various subclasses is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendants' records, the records of vendors of ZYN and the certifications of ZYN users.

131.     <u>Typicality</u>.  Plaintiff's claims arise out of the same common course of conduct that gives rise to the claims of the other class members. Plaintiff and all class members were and will continue to be damaged by the same wrongful conduct—*i.e.*, Defendants' scheme to engage in fraudulent and unfair business practices regarding the marketing and sale of ZYN, including the marketing of ZYN to minors.

132.     <u>Adequacy</u>.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class and Subclass. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

133.     <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest.</u>  Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted

on grounds generally applicable to the Classes.  Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Classes include:

     (a)    Whether Defendants' marketing of ZYN;

     (b)    Whether Defendants' targeting of youth and young adults in the marketing and sale ZYN was unfair and/or unconscionable;

     (c)    Whether Defendants have been unjustly enriched through the false, misleading and deceptive advertising of ZYN and the marketing and sale of ZYN to youth and young adults;

     (d)    The amount of damages owed to the Class and Subclasses;

     (e)    The appropriate measure of disgorgement;

     (f)    Whether the Class and Subclasses are entitled to injunctive relief; and

     (g)    Whether Defendants breached the implied warranty of merchantability.

134.    <u>Superiority</u>.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## **CLAIMS FOR RELIEF**

135.    Except as otherwise noted, Plaintiff brings each of his claims on behalf of the Nationwide Class and, in the alternative, on behalf of each of the Subclasses.

<u>COUNT I</u>
**Violation of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*) (Sales and Marketing Practices)**

136.    Plaintiff incorporates the allegations above as though fully set forth herein.

137.    This claim is brought against all Defendants.

138.    Each Defendant is a "person" under Cal. Bus. & Prof. Code § 17201.

139.    Plaintiff and class members purchased ZYN for personal purposes.

140.    Defendants created and implemented a scheme to create a market for oral nicotine pouches and substantially increase sales of ZYN through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray ZYN as cool and safe alternatives to combustible and e-cigarettes, with a particular emphasis on appealing to minors, while misrepresenting and omitting key facts concerning ZYN's addictiveness, health and safety features and significant risks of substantial physical injury from using ZYN.

141.    Advertisements and representations for ZYN contained deceptive statements that ZYN was healthy and safe, a smoking-cessation device and a reasonable alternative to combustible and e-cigarettes. Like the tobacco companies that marketed combustible cigarettes and smokeless tobacco in previous decades, Defendants used third parties and word of mouth to spread false and misleading information about ZYN.

142.    Advertisements and representations for ZYN concealed and failed to disclose that ZYN was not a smoking-cessation device or a reasonable alternative to combustible or e-cigarettes, was an extremely potent nicotine-delivery mechanism, was powerfully addictive and posed significant risks of substantial physical injury resulting from the use of the product.

143.    The labels on ZYN failed to disclose that ZYN posed significant risks of substantial physical injury resulting from the use of ZYN.

144.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Defendants' advertising of its products as reasonable alternatives to combustible and e-cigarettes.

145.    Defendants' conduct was unfair and unconscionable in that it included: (a) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries; and (b) misrepresentations and omissions of material facts concerning the characteristics and safety of ZYN that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous and substantially injurious; and caused substantial harm that greatly outweighs and possible utility from the conduct.

146.    Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers, including Plaintiff. Reasonable consumers, including Plaintiff, would have found it material to their purchasing decisions that ZYN: (a) was not a smoking-cessation device; (b) was not a reasonable alternative to combustible or e-cigarettes; (c) was an extremely potent nicotine-delivery mechanism; (d) was powerfully addictive; (e) was not healthy and safe; and (f) posed unreasonable risks of substantial bodily injury resulting from use of ZYN. Knowledge of these facts would have been a substantial factor in Plaintiff's and class members' decisions to purchase ZYN.

147.    Defendants owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to Defendants, who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; because ZYN poses an unreasonable risk of substantial bodily injury; and because Defendants made partial representations concerning the same subject matter as the omitted facts.

148.    In purchasing ZYN, each Plaintiff relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

149.    Defendants further engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that ZYN was appropriate for minors, when in fact ZYN never should have been marketed to minors and is especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities and health risks.

150.     Defendants engaged in conduct that is unfair and unconscionable because the targeting of minors offends public policy; is immoral, unethical, oppressive, outrageous, unscrupulous and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

151.     As alleged above, Defendants participated in, and/or facilitated the marketing of ZYN to minors and took no action to curb the use of ZYN by minors. Defendants have continued the deceptive, misleading, unfair and unconscionable practices that Defendants implemented, facilitated and/or did not take adequate steps to stop. As a result, the use of ZYN by minors continues to rise.

152.     Defendants' conduct actually and proximately caused Plaintiff and class members to lose money or property. Absent Defendants' unfair and fraudulent conduct, Plaintiff and class members would have behaved differently and would not have purchased ZYN or would have paid less for ZYN. Defendants' misrepresentations and omissions induced Plaintiff and class members to purchase ZYN that they would not otherwise have purchased. In addition, class members who are minors are entitled to full repayment of the amounts they spent on ZYN. Plaintiff seeks – on behalf of himself and each member of the class – restitution, injunctive relief and reasonable attorneys' fees, as well as any other relief the Court deems just or proper.

## COUNT II
### Violation of the California Consumer Legal Remedies Act
### (Cal. Civ. Code § 1750, *et seq.*)

153.     Plaintiff incorporates the allegations set forth above as though fully set forth herein.

154.     This claim is brought against all Defendants.

155.     Each Defendant is a "person" under Cal. Civ. Code § 1761.

156.     Plaintiff and class members are "consumers" under Cal. Civ. Code § 1761 and purchased ZYN for personal purposes.

157.     ZYN constitutes "goods" under Cal. Civ. Code § 1761.

158.     Defendants created and implemented a scheme to create a market for oral nicotine pouches and substantially increase sales of ZYN through a pervasive pattern of false and

misleading statements and omissions. Defendants aimed to portray ZYN as cool and safe alternatives to combustible and e-cigarettes, with a particular emphasis on appealing to minors, while misrepresenting and omitting key facts concerning ZYN's addictiveness, health and safety features and significant risks of substantial physical injury from using ZYN.

159.    Advertisements and representations for ZYN contained deceptive statements that ZYN was healthy and safe, a smoking-cessation device and a reasonable alternative to combustible and e-cigarettes. Like the tobacco companies that marketed combustible cigarettes and smokeless tobacco in previous decades, Defendants used third parties and word of mouth to spread false and misleading information about ZYN.

160.    Advertisements and representations for ZYN concealed and failed to disclose that ZYN was not a smoking-cessation device or a reasonable alternative to combustible or e-cigarettes, was an extremely potent nicotine-delivery mechanism, was powerfully addictive and posed significant risks of substantial physical injury resulting from the use of the product.

161.    The labels on ZYN failed to disclose that ZYN posed significant risks of substantial physical injury resulting from the use of ZYN.

162.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Defendants' advertising of its products as reasonable alternatives to combustible and e-cigarettes.

163.    Defendants' conduct was unfair and unconscionable in that it included: (a) the manufacture and sale of products with a heightened propensity to cause addiction and physical injuries; and (b) misrepresentations and omissions of material facts concerning the characteristics and safety of ZYN that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous and substantially injurious; and caused substantial harm that greatly outweighs and possible utility from the conduct.

164.    Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers, including Plaintiff. Reasonable consumers, including Plaintiff, would have found it material to their

purchasing decisions that ZYN: (a) was not a smoking-cessation device; (b) was not a reasonable alternative to combustible or e-cigarettes; (c) was an extremely potent nicotine-delivery mechanism; (d) was powerfully addictive; (e) was not healthy and safe; and (f) posed unreasonable risks of substantial bodily injury resulting from use of ZYN. Knowledge of these facts would have been a substantial factor in Plaintiff's and class members' decisions to purchase ZYN.

165.    Defendants owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to Defendants, who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; because ZYN poses an unreasonable risk of substantial bodily injury; and because Defendants made partial representations concerning the same subject matter as the omitted facts.

166.    In purchasing ZYN, each Plaintiff relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

167.    Defendants further engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively and misleadingly convey that ZYN was appropriate for minors, when in fact ZYN never should have been marketed to minors and is especially harmful to minors due to the potent and addictive nicotine doses, addictive qualities and health risks.

168.    Defendants engaged in conduct that is unfair and unconscionable because the targeting of minors offends public policy; is immoral, unethical, oppressive, outrageous, unscrupulous and substantially injurious; and has caused substantial harm that greatly outweighs any possible utility from the conduct.

169.    As alleged above, Defendants participated in, and/or facilitated the marketing of ZYN to minors and took no action to curb the use of ZYN by minors. Defendants have continued the deceptive, misleading, unfair and unconscionable practices that Defendants implemented, facilitated and/or did not take adequate steps to stop. As a result, the use of ZYN by minors continues to rise.

170.     Defendants' conduct actually and proximately caused Plaintiff and class members to lose money or property. Absent Defendants' unfair and fraudulent conduct, Plaintiff and class members would have behaved differently and would not have purchased ZYN or would have paid less for ZYN. Defendants' misrepresentations and omissions induced Plaintiff and class members to purchase ZYN that they would not otherwise have purchased. In addition, class members who are minors are entitled to full repayment of the amounts they spent on ZYN. Plaintiff seeks – on behalf of himself and each member of the class – restitution, injunctive relief and reasonable attorneys' fees, as well as any other relief the Court deems just or proper.

171.     Pursuant to California Civil Code § 1780(a)(3), Plaintiff, on behalf of himself and all other members of the Class and Subclasses, seek injunctive relief.

172.     On March 22, 2024, prior to filing this action, Defendants were served with a pre-suit notice letter pursuant to CLRA § 1782. The letter was sent certified mail, return receipt requested, and provided notice of Defendants' violation of the CLRA and demands that Defendants correct the unlawful, unfair, false and/or deceptive practices alleged here. If Defendants do not fully correct the problem for Plaintiff and for each member of the Class and Subclasses within 30 days after service of Plaintiff's notice letter, Plaintiff and the California subclass will amend the complaint to seek all monetary relief allowed under the CLRA.

### COUNT III
**Violation of the California False Advertising Law**
**(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

173.     Plaintiff incorporate the allegations set forth above as though fully set forth herein.

174.     This claim is brought against all Defendants.

175.     Defendants intended to directly and indirectly sell ZYN. Defendants induced consumers within and outside California to buy ZYN and made and disseminated, and caused to be made and disseminated from California, including via advertisements run on the Facebook platform of Meta Platforms, Inc., misrepresentations that were untrue and misleading.

176.     Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers to rely on such misrepresentations and omissions.

177.     The misrepresentations and omissions were likely to, and in fact did, deceive reasonable consumers, including Plaintiff. Reasonable consumers, including Plaintiff, would have found it material to their purchasing decisions that ZYN: (a) was not a smoking-cessation device; (b) was not a reasonable alternative to combustible or e-cigarettes; (c) was an extremely potent nicotine-delivery mechanism; (d) was powerfully addictive; (e) was not healthy and safe; and (f) posed unreasonable risks of substantial bodily injury resulting from use of ZYN. Knowledge of these facts would have been a substantial factor in Plaintiff's and class members' decisions to purchase ZYN.

178.     Defendants owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to Defendants, who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; because ZYN poses an unreasonable risk of substantial bodily injury; and because Defendants made partial representations concerning the same subject matter as the omitted facts.

179.     In purchasing ZYN, Plaintiff relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

180.     Defendants' conduct actually and proximately caused Plaintiff and class members to lose money or property. Absent Defendants' conduct, Plaintiff and class members would have behaved differently and would not have purchased ZYN or would have paid less for ZYN. Defendants' misrepresentations and omissions induced Plaintiff and class members to purchase ZYN that they would not otherwise have purchased. In addition, class members who are minors are entitled to full repayment of the amounts they spent on ZYN. Plaintiff seek – on behalf of

themselves and each member of the class – restitution, injunctive relief and reasonable attorneys' fees, as well as any other relief the Court deems just or proper.

## COUNT IV
### Common Law Fraud

181.    Plaintiff incorporates the allegations set forth above as though fully set forth herein.

182.    This claim is brought against all Defendants.

183.    Defendants created and implemented a scheme to create a market for oral nicotine pouches and substantially increase sales of ZYN through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray ZYN as cool and safe alternatives to combustible and e-cigarettes, with a particular emphasis on appealing to minors, while misrepresenting and omitting key facts concerning ZYN's addictiveness, health and safety features and significant risks of substantial physical injury from using ZYN.

184.    Advertisements and representations for ZYN contained deceptive statements that ZYN was healthy and safe, a smoking-cessation device and a reasonable alternative to combustible and e-cigarettes. Like the tobacco companies that marketed combustible cigarettes and smokeless tobacco in previous decades, Defendants used third parties and word of mouth to spread false and misleading information about ZYN.

185.    Advertisements and representations for ZYN concealed and failed to disclose that ZYN was not a smoking-cessation device or a reasonable alternative to combustible or e-cigarettes, was an extremely potent nicotine-delivery mechanism, was powerfully addictive and posed significant risks of substantial physical injury resulting from the use of the product.

186.    The labels on ZYN failed to disclose that ZYN posed significant risks of substantial physical injury resulting from the use of ZYN.

187.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Defendants' advertising of its products as reasonable alternatives to combustible and e-cigarettes.

188.    Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers, including

Plaintiff. Reasonable consumers, including Plaintiff, would have found it material to their purchasing decisions that ZYN: (a) was not a smoking-cessation device; (b) was not a reasonable alternative to combustible or e-cigarettes; (c) was an extremely potent nicotine-delivery mechanism; (d) was powerfully addictive; (e) was not healthy and safe; and (f) posed unreasonable risks of substantial bodily injury resulting from use of ZYN. Knowledge of these facts would have been a substantial factor in Plaintiff's and class members' decisions to purchase ZYN.

189. Defendants owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to Defendants, who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; because ZYN poses an unreasonable risk of substantial bodily injury; and because Defendants made partial representations concerning the same subject matter as the omitted facts.

190. In purchasing ZYN, each Plaintiff relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

191. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers to rely on such misrepresentations and omissions.

192. Defendants' conduct actually and proximately caused damages to Plaintiff and class members. Absent Defendants' conduct, Plaintiff and class members would have behaved differently and would not have purchased ZYN or would have paid less for ZYN. Defendants' misrepresentations and omissions induced Plaintiff and class members to purchase ZYN that they would not otherwise have purchased. Plaintiff seeks – on behalf of himself and each member of the class – damages in an amount to be proven at trial, as well as any other relief the Court deems just or proper.

**COUNT V**
**Breach of the Implied Warranty of Merchantability**

193.    Plaintiff incorporates the allegations set forth above as though fully set forth herein.

194.    This claim is brought against all Defendants.

195.    On March 22, 2024, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a warranty notice letter that complied in all respects with U.C.C. 2-607.  The letter provided notice of breach of express and implied warranties. The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the U.C.C. 2-607 and state consumer protection laws and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.

196.    Each Defendant has at all times been a merchant with respect to the products that were sold to each Plaintiff and the class and was in the business of selling such products.

197.    ZYN comes with an implied warrant that it will be merchantable and fit for the ordinary purpose for which it would be used. Cal. Comm Code § 2314. Defendants have breached their implied warranty of merchantability because ZYN: (a) was not in merchantable condition when sold; (b) was defective when sold; (c) did not conform to the promises and affirmations of fact made on ZYN's container or label; and (d) does not possess even the most basic degree of fitness for ordinary use.

198.    The ordinary purpose for ZYN – and the purpose for which it is marketed, promoted and sold – is to serve as a safe alternative to combustible and e-cigarettes and as a smoking-cessation device. ZYN is not fit for that use – or any other use – because it: (a) was not a smoking-cessation device; (b) was not a reasonable alternative to combustible or e-cigarettes; (c) was an extremely potent nicotine delivery device; (d) was powerfully addictive; and (e) posed an unreasonable risk of substantial bodily injury. Due to these and other features, ZYN is not fit for its ordinary, intended use as either combustible or e-cigarette replacement device or a recreational smoking device.

199.    Plaintiff and each member of the class has had sufficient direct dealings with Defendants via their website or their agents (including distributors, dealers and sellers authorized by Defendants) to establish privity of contract between Defendants, on the one hand, and Plaintiff and each member of the class on the other hand.

200.    Further, Plaintiff and each member of the class were third-party beneficiaries of Defendants' agreements with its distributors, dealers and sellers for the distribution, dealing and sale of ZYN to consumers. Specifically, Plaintiff and class members are the intended beneficiaries of Defendants' implied warranties. Defendants' products are manufactured with the express purpose and intent of being sold to consumers.

201.    Plaintiff and class members were injured as a direct and proximate result of Defendants' breach of its implied warranties of merchantability because, had they been aware of the unmerchantable condition of ZYN, they would not have purchased ZYN or would have paid less for it. Plaintiff seeks damages in an amount to be proven at trial, as well as any other relief the Court may be deem just or proper.

**COUNT VI**
**Unjust Enrichment**

202.    Plaintiff incorporates the allegations set forth above as though fully set forth herein.

203.    This claim is brought against all Defendants.

204.    Defendants created and implemented a scheme to create a market for oral nicotine pouches and substantially increase sales of ZYN through a pervasive pattern of false and misleading statements and omissions. Defendants aimed to portray ZYN as a cool and safe alternative to combustible and e-cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerning ZYN's addictiveness, health and safety features and significant risks of substantial physical injury from using ZYN.

205.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading advertisements and omissions regarding: (a) whether ZYN was a smoking-cessation device; (b) whether ZYN is a reasonable alternative to combustible or e-cigarettes; (c) whether ZYN was an extremely potent nicotine-delivery mechanism; (d) whether

ZYN was powerfully addictive; (e) whether ZYN was not healthy and safe; and (f) whether ZYN posed unreasonable risks of substantial bodily injury resulting its use.

206.    Defendants requested and received a measurable benefit at the expense of Plaintiff and class members in form of payment for ZYN.

207.    Defendants appreciated, recognized and chose to accept the monetary benefits Plaintiff and class members conferred onto Defendants at Plaintiff's and class members' detriment. These benefits were the expected result of Defendants acting in their own pecuniary interest at the expense of their customers.

208.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

209.    Plaintiff and class members are entitled to restitution of the benefits Defendants unjust retained and/or any amounts necessary to return Plaintiff and class members to the position they occupied prior to dealing with Defendants.

210.    Plaintiff pleads this claim separately as well as in the alternative to his claims, as without such claims they would have no adequate legal remedy.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   For a determination that this action is a proper class action;

b.   For an order certifying the Nationwide Class and Subclasses, naming Plaintiff as representative of the Nationwide Class and Subclasses, and naming Plaintiff's attorneys as Class Counsel to represent the Nationwide Class and Subclasses;

c.   For an order declaring that Defendants' conduct violates the statutes referenced herein;

d.   For an order finding in favor of Plaintiff, the Nationwide Class, and the Subclasses on all counts asserted herein;

e.  For an award of compensatory damages and restitution to Plaintiff, Nationwide Class, and Subclass Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.  For punitive damages, as warranted, in an amount to be determined at trial;

g.  For an order requiring Defendants to disgorge revenues and profits wrongfully obtained;

h.  For prejudgment interest on all amounts awarded;

i.  For injunctive relief as pleaded or as the Court may deem proper;

j.  For an order awarding Plaintiff, the Nationwide Class, and the Subclasses their reasonable attorneys' fees and expenses and costs of suit; and

k.  For an order granting Plaintiff, Nationwide Class, and Subclass Members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff on behalf of himself and the proposed Nationwide Class and Subclasses, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: March 29, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:____*/s/ Brittany S. Scott*____
            Brittany S. Scott

L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
           bscott@bursor.com

*Attorneys for Plaintiff and the Putative Class*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Brittany S. Scott, declare as follows:

      1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an Associate at Bursor & Fisher, P.A., counsel of record for Plaintiff in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

      2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Eastern District of California.

      I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California on March 29, 2024.

                                */s/ Brittany S. Scott*
                                 Brittany S. Scott